_____ FILED  _____ ENTERED
_____ LODGED  _____ RECEIVED

JUL 29 2019

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

The Honorable Mary Alice Theiler

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> STEFAN ANDREI, <br><br> Defendant. | NO. MJ19-345 <br><br> **COMPLAINT FOR VIOLATION** <br><br> Title 18, United States Code, Sections 1956(h), 1960, and 1956(a)(3) |

BEFORE United States Magistrate Judge Mary Alice Theiler, Seattle, Washington. The undersigned complainant being duly sworn states:

## COUNT 1
### (Money Laundering Conspiracy)

1.     From at least October 30, 2018 until on or about April 29, 2019, in King County, in the Western District of Washington, and elsewhere, the defendant, STEFAN ANDREI, and other persons both known and unknown, did unlawfully, knowingly, and intentionally combine, conspire, confederate and agree together and with each other to commit certain money laundering offenses in violation of Title 18, United States Code, Section 1956(h), as follows: To knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is distributing narcotics, in violation of Title

COMPLAINT/ANDREI - 1
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

21, United States Code, Section 841, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### Manner and Means of the Conspiracy

2.      The conspiracy was executed in the following manner through the following means.

3.      It was part of the conspiracy that, beginning at a time unknown but from at least October 30, 2018, an unindicted co-conspirator ("UCC-1") sold narcotics, including methamphetamine, heroin, and cocaine, on Dream Market, a Dark Net marketplace, in exchange for bitcoins (or "BTC").

4.      It was further part of the conspiracy that ANDREI, who advertised on localbitcoins.com, would provide cash[1] to UCC-1 in exchange for UCC-1's bitcoins.  In doing so, ANDREI knew, or should have known, that the bitcoins purchased from UCC-1 represented the proceeds of the illegal distribution of narcotics.

5.      It was further part of the conspiracy that, when ANDREI purchased UCC-1's bitcoins, ANDREI charged a fee, often 9%.  Shortly after UCC-1 transferred the bitcoins to ANDREI's cryptocurrency wallet, ANDREI would transfer those bitcoins into another cryptocurrency wallet to further conceal the source of the funds.

6.      In furtherance of the conspiracy, and to attain the ends thereof, on or about the below dates, STEFAN ANDREI, and others known and unknown, conducted and caused to be conducted the following financial transactions, among others:

---

[1] Unless otherwise specified, all references herein to "cash" refer to United States currency.

| Date | Amount[2] | Description of Transaction | Bitcoin Value[3] |
|---|---|---|---|
| 11/3/18 | .351 BTC | Purchased from UCC-1 | $2,235.00 |
| 11/6/18 | .399 BTC | Purchased from UCC-1 | $2,572.63 |
| 11/14/18 | .219 BTC | Purchased from UCC-1 | $1,297.10 |
| 11/24/18 | .357 BTC | Purchased from UCC-1 | $1,458.92 |
| 11/26/18 | .769 BTC | Purchased from UCC-1 | $2,969.69 |
| 11/29/18 | .536 BTC | Purchased from UCC-1 | $2,298.12 |
| 12/26/18 | .548 BTC | Purchased from UCC-1 | $2,101.80 |
| 1/1/19 | .255 BTC | Purchased from UCC-1 | $969.73 |
| 1/3/19 | .284 BTC | Purchased from UCC-1 | $561.36 |
| 1/7/19 | .128 BTC | Purchased from UCC-1 | $520.57 |
| 1/9/19 | .366 BTC | Purchased from UCC-1 | $1,483.38 |
| 1/11/19 | .351 BTC | Purchased from UCC-1 | $1,289.24 |
| 1/26/19 | .27 BTC | Purchased from UCC-1 | $979.43 |
| 1/28/19 | .427 BTC | Purchased from UCC-1 | $1,488.12 |
| 2/5/19 | .407 BTC | Purchased from UCC-1 | $1,396.73 |

7.     In total, ANDREI purchased more than 5.6 bitcoins from UCC-1 during the timeframe of October 2018 until April 2019, which at the time were worth more than $20,000.

All in violation of Title 18, United States Code, Section 1956(h).

<u>**COUNT 2**</u>
**(Conducting an Unlicensed Money Transmitting Business)**

8.     Beginning at a time unknown, but not later than September 25, 2018, and continuing until the present, in King County, within the Western District of Washington, and elsewhere, the defendant, STEFAN ANDREI did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business affecting interstate and foreign commerce, which: (a) was operated without an appropriate money transmitting license in a State where such operation is punishable as a as a misdemeanor and a felony under State law, to wit, the State of Washington; (b) failed

[2] All bitcoin figures included in this affidavit are approximated.
[3] This column represents the approximate value of the bitcoins purchased at the time the transaction was completed.

COMPLAINT/ANDREI - 3
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   to comply with the money transmitting business registration requirements set forth in

2   Title 31, United States Code, Section 5330, and the regulations prescribed thereunder,

3   and; (c) otherwise involved the transportation and transmission of funds that are known

4   to the defendant to have been derived from a criminal offense and are intended to

5   promote and support unlawful activity.

6       All in violation of Title 18, United States Code, Sections 1960(a), (b)(1)(A),

7   (b)(1)(B), (b)(1)(C), and 2.

## COUNTS 3-5
### (Laundering of Monetary Instruments)

9.      On or about the dates listed below, in King County, within the Western

District of Washington, and elsewhere, the defendant, STEFAN ANDREI, with the intent

to conceal or disguise the nature, location, source, ownership, and control of property

believed to the proceeds of specified unlawful activity, and to avoid a transaction

reporting requirement under State and Federal law, did knowingly and willfully conduct

and attempt to conduct a financial transaction affecting interstate or foreign commerce

involving property represented by a law enforcement officer to be proceeds of specified

unlawful activity, to wit, trafficking in persons and recruiting and harboring a person for

commercial sex acts, and growing and distributing marijuana:

| COUNT | Date | Amount[4] | Description | Transaction Amount |
|-------|------|-----------|-------------|--------------------|
| 3 | 3/14/19 | 7.168 BTC | ANDREI sold bitcoins for cash | $30,000 |
| 4 | 4/19/19 | 8.684 BTC | ANDREI sold bitcoins for cash | $50,000 |
| 5 | 6/27/19 | 4.356 BTC | ANDREI sold bitcoins for cash | $50,000 |

All in violation of Title 18, United States Code, Sections 1956(a)(3)(B), (a)(3)(C) and 2.

    And the complainant states that this Complaint is based on the following

information:

_____

[4] All bitcoin figures included in this affidavit are approximated.

COMPLAINT/ANDREI - 4
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      **I, Ernest McGeachy, being first duly sworn on oath, depose and say:**

2      10.     I am a Special Agent with the U.S. Department of Homeland Security,

3 Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations

4 ("HSI"), assigned to the Special Agent in Charge ("SAC"), in Seattle, Washington. I

5 have been a special agent with HSI since October 2010. HSI is responsible for enforcing

6 the customs and immigration laws and federal criminal statutes of the United States. As

7 part of my duties, I investigate criminal violations relating to cybercrimes on the Dark

8 Net, and human smuggling and trafficking. I have investigated and/or participated in

9 many federal criminal investigations involving human smuggling and trafficking and

10 cybercrimes on the Dark Net.

11      11.     I am a graduate of the Federal Law Enforcement Training Center

12 ("FLETC") Basic Criminal Investigator Training Program, the Immigration and Customs

13 Special Agent Training Program, and the Naval Criminal Investigative Service ("NCIS")

14 Special Agent Training Program. Before joining HSI, I worked as a special agent with

15 NCIS, and as a Customs and Border Protection officer. I have been a federal law

16 enforcement officer for over twenty years. I hold a bachelor's degree in Political Science

17 from Western Washington University. I also hold a master's degree in Human Relations

18 from the University of Oklahoma.

19      12.     This affidavit is made in support of a complaint for the arrest of STEFAN

20 ANDREI for violations of Title 18, United States Code, Sections 1956(h) (Money

21 Laundering Conspiracy), 1960 (Operating an Unlicensed Money Transmitting Business)

22 and 1956(a)(3) (Money Laundering). Because this affidavit is submitted for that limited

23 purpose, I am not including every fact known to me about this defendant or the larger

24 investigation.

25      13.     The information in this affidavit is based upon the investigation I have

26 conducted in this case, my conversations with other law enforcement officers who have

27 engaged in various aspects of this investigation, and my review of reports written by

28 other law enforcement officers involved in this investigation.

COMPLAINT/ANDREI - 5
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
## PROBABLE CAUSE

2
**I.   Summary of Investigation**

3
14.   From at least September 2018 through the present, ANDREI advertised on

4
localbitcoins.com, using monikers including "zzzbtczzz" and "littlebitofcoins."  On

5
localbitcoins.com, ANDREI offered to exchange bitcoins  for cash, or cash for bitcoins,

6
at locations including Seattle, Washington.  During this timeframe, ANDREI sold or

7
purchased bitcoins in exchange for cash without registering with the United States

8
Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN") or the

9
Washington Department of Financial Institutions ("DFI"), in violation of 18 U.S.C.

10
§ 1960.

11
15.   From at least October 2018, ANDREI purchased bitcoins from an

12
unindicted co-conspirator ("UCC-1") who located ANDREI's ad on localbitcoins.com.

13
UCC-1 earned these bitcoins by selling methamphetamine, heroin, and cocaine on the

14
Dark Net marketplace, Dream Market.  During the time period of October 2018 until

15
April 2019, ANDREI purchased bitcoins from UCC-1 that he knew, or should have

16
known, were obtained from illegal drug sales.

17
16.   Additionally, from September 2018 until June 2019, ANDREI sold bitcoin

18
to three undercover agents in exchange for cash.  During this time period, ANDREI

19
exchanged at least $130,000 in cash for bitcoins despite being told that these funds

20
represented proceeds of human trafficking and growing and distributing marijuana.

21
ANDREI did not require or request any identification or "Know Your Customer"

22
("KYC") information from the relevant undercover agents before conducting the

23
transactions.

24
17.   As a result, ANDREI is alleged to have engaged in a money laundering

25
conspiracy, in violation of 18 U.S.C. § 1956(h), operating an unlicensed money

26
transmission business, in violation of 18 U.S.C. § 1960, and money laundering, in

27
violation of 18 U.S.C. § 1956(a)(3).

28

COMPLAINT/ANDREI - 6
USAO #2019R00061

## II.      LocalBitcoins Advertisements

18.     In September 2018, HSI Special Agent Judson Scott located an advertisement posted by a user with the moniker "zzzbtczzz" on the website localbitcoins.com.  Localbitcoins.com is a website that allows users to post advertisements, listing exchange rates and payment methods for buying and selling bitcoins, including allowing users to connect with bitcoin sellers in their vicinities through in-person meetings where cash is exchanged for bitcoins.

19.     According to his advertisement, zzzbtczzz offered to conduct peer-to-peer transactions, anonymously exchanging cash for bitcoins, listing the telephone number (206) 910-4647 as his contact number.  As described herein, this telephone number and moniker are used by ANDREI.

20.     As of at least January 2019, ANDREI stopped using the moniker zzzbtczzz and instead placed a new ad on localbitcoins.com using the moniker "littlebitofcoins." Littlebitofcoins advertised under the section titled "Buy Bitcoins with Cash in U.S. Dollar (USD)" and listed the telephone number (206) 910-4647 as his contact number—the same telephone number listed for zzzbtczzz.

## III.     Undercover Cryptocurrency Transactions

21.     From in or around September 2018 until June 2019, ANDREI sold bitcoins to three undercover agents in exchange for cash.  Initially, law enforcement located ANDREI's zzzbtczzz advertisement, in which zzzbtczzz offered to conduct peer-to-peer transactions, anonymously exchanging cash for bitcoins, listing telephone number (206) 910-4647 as his contact number.

### A.      <u>The September 25, 2018 Meeting</u>

22.     In September 2018, Agent Scott—using the alias "Justin"—contacted zzzbtczzz via the telephone number (206) 910-4647, claiming to want to purchase

COMPLAINT/ANDREI - 7
USAO #2019R00061

1   bitcoins.  After communicating with zzzbtczzz, Agent Scott and zzzbtczzz both agreed to

2   meet on September 25, 2018.[5]

3       23.      On September 25, 2018, zzzbtczzz and an HSI undercover agent ("UCA-

4   1") met at a Starbucks located in Seattle, Washington.  Zzzbtczzz arrived at the Starbucks

5   in a dark blue, BMW sedan bearing Washington State license plate BCW4122

6   ("ANDREI's Vehicle").  Database checks revealed that ANDREI is the registered owner

7   of the vehicle.  Zzzbtczzz was subsequently identified as ANDREI after comparing

8   images obtained from Washington State Department of Licensing.  Additionally, during

9   the meeting at Starbucks, zzzbtczzz introduced himself to UCA-1 as "STEFAN."  This

10  meeting was audio and video recorded.

11      24.      Once ANDREI arrived, UCA-1 explained that Justin was his/her partner.

12  UCA-1 and ANDREI agreed to exchange $10,000 in cash for bitcoins.  ANDREI

13  indicated that he would charge an exchange fee of 6.5% for the transaction.  Based on my

14  training and experience, I know that unlicensed cryptocurrency exchangers often charge

15  fees substantially higher than those charged by legitimate, licensed exchanges—which

16  are required to collect and maintain customer information—in part because the customers

17  of unlicensed exchanges may be or appear to be wary of attracting law enforcement

18  attention.  For example, Coinbase, a registered cryptocurrency exchange, generally sells

19  cryptocurrencies at their market price plus a service fee of approximately 1.49%.

20      25.      After ANDREI and UCA-1 confirmed the amount and fee for the exchange,

21  ANDREI requested that they continue the meeting in his vehicle.  ANDREI sat in the

22  driver's seat of ANDREI's Vehicle while UCA-1 stood outside the open, driver's side

23  door.  UCA-1 provided ANDREI with $10,000 in cash, which ANDREI counted and

24  checked for counterfeit bills using a yellow-colored marker.

25

26

27

28

[5] ANDREI initially sought to meet at a Bank of America but Agent Scott suggested they meet at a Starbucks.

COMPLAINT/ANDREI - 8
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

26.     Agent Scott provided ANDREI the wallet address to which the bitcoins were to be transferred, sent via text message to the telephone number (206) 910-4647, using an undercover phone. This wallet was maintained by law enforcement. Using his cell phone, ANDREI transferred to the law enforcement wallet approximately 1.46907013 BTC, which were worth approximately $9,371.57 on the date of the transaction. During the meeting, ANDREI indicated that he could exchange a larger sum in the future, such as $200,000, if that amount were broken up across multiple days.

27.     At no time during the transaction did ANDREI request any identification from UCA-1 or ask for "KYC" information. After the exchange, agents maintained surveillance of ANDREI's Vehicle. Agents observed ANDREI drive to the address listed as his residence on his Washington State driver's license, located at 2203 East Union Street in Seattle, Washington.

**B.    The October 25, 2018 Meeting**

28.     On October 25, 2018, UCA-1 again met with ANDREI for the purpose of exchanging $15,000 in cash for bitcoins. This meeting occurred at a Starbucks in Seattle, Washington. ANDREI arrived at the meeting on foot. This meeting was audio and video recorded.

29.     During the meeting, UCA-1 gave $15,000 in cash to ANDREI, which ANDREI counted and placed into his coat pockets. ANDREI indicated that he would charge an exchange fee of 6.5% for the transaction. Agent Scott then provided ANDREI the wallet address to which the bitcoins were to be transferred, sent via text message to the telephone number (206) 910-4647, using an undercover phone. This wallet was maintained by law enforcement. Using his cell phone, ANDREI transferred approximately 2.18942171 BTC to the law enforcement wallet, which were worth approximately $14,195.07 on the date of the transaction.

30.     During the meeting, UCA-1 inquired about methods that could be used to remain anonymous when sending bitcoins overseas. ANDREI told UCA-1 to not store his/her wallet on any personal device that could be traced back to him/her through an

COMPLAINT/ANDREI - 9
USAO #2019R00061

1  Internet Protocol ("IP") address.  ANDREI also suggested that UCA-1 load his/her wallet

2  onto a burner phone.

3    31.    At no time during the transaction did ANDREI request any identification

4  from UCA-1 or ask for "KYC" information.

**C.    The February 7, 2019 Meeting**

6    32.    In January 2019, I reviewed advertisements on localbitcoins.com under the

7  section titled "Buy Bitcoins with Cash in U.S. Dollar (USD)."  I observed a seller using

8  the moniker "littlebitofcoins" advertising in Seattle, Washington and Bellingham,

9  Washington.  Littlebitofcoins' profile listed the telephone number (206) 910-4647 as his

10  contact number—the same telephone number which, as described above, was associated

11  with zzzbtczzz and ANDREI.  In January 2019, a search for zzzbtczzz on

12  localbitcoins.com revealed that ANDREI was no longer using that moniker for Bitcoin

13  advertisements on the website.

14    33.    In February 2019, I responded to littlebitofcoins' advertisement, using the

15  alias "Carlos."  Littlebitofcoins' offered to conduct peer-to-peer transactions,

16  anonymously exchanging cash for bitcoins.  A deal was ultimately set up with

17  littlebitofcoins, who agreed to meet on February 7, 2019.[6]

18    34.    On February 7, 2019, littlebitofcoins and an HSI undercover agent ("UCA-

19  2") met at a Starbucks in Tukwila, Washington.  Littlebitofcoins arrived at the Starbucks

20  in ANDREI's Vehicle.  Based on surveillance, it was determined that littlebitofcoins was

21  ANDREI, again by comparing images obtained from Washington State's Department of

22  Licensing.  The meeting was audio recorded.

23    35.    During the meeting, UCA-2 explained that Carlos was his business partner.

24  UCA-2 handed ANDREI $20,000 in cash to exchange for bitcoins.  ANDREI counted the

25  cash and told UCA-2 that he would bring a money counter next time.  ANDREI told

26  _____

27  [6] ANDREI initially sought to meet at a Bank of America but I suggested they meet at a
    Starbucks.  ANDREI explained "They can count the money for us too.  No ID required.  I feel

28  more comfortable in a bank then a coffee shop plus I make sure I don't get any fake bills."

COMPLAINT/ANDREI - 10
USAO #2019R00061

1  UCA-2 that ANDREI has two money counters at home. ANDREI also indicated that he

2  would charge an exchange fee of 8% for the transaction.

3      36.     I provided ANDREI the wallet address to which the bitcoins were to be

4  transferred, sent via text message to the telephone number (206) 910-4647, using an

5  undercover phone. This wallet was maintained by law enforcement. Using his cell

6  phone, ANDREI transferred to the law enforcement wallet approximately 5.47444712

7  BTC, which were worth approximately $18,400 on the date of the transaction.

8      37.     During this meeting, UCA-2 asked ANDREI if ANDREI could exchange

9  currency for bitcoins on a regular basis. ANDREI told UCA-2 that ANDREI could

10  exchange up to $10,000,000 for bitcoins if that amount were broken up into smaller

11  transactions. Additionally, ANDREI told UCA-2 that ANDREI could exchange

12  $100,000 per week if the exchange were broken up into two transactions per week.

13  During the meeting, ANDREI told UCA-2: "This is what I do. It is best if we do not

14  know each other's business."

15      38.     At no time during the transaction did ANDREI request any identification

16  from UCA-2 or ask for "KYC" information. After the exchange, agents maintained

17  surveillance of ANDREI's Vehicle. Agents observed ANDREI's Vehicle park on Union

18  Street between 22nd and 23rd Avenues in the vicinity of ANDREI's residence, located at

19  2203 East Union Street in Seattle, Washington.

20      **D.   The March 14, 2019 Meeting**

21      39.     On March 14, 2019, ANDREI and UCA-2 again met at a Starbucks in

22  Seattle, Washington. ANDREI arrived at Starbucks on foot. ANDREI and UCA-2

23  briefly met inside Starbucks before moving the meeting to ANDREI's car, which was a

24  2012 BMW 750 bearing Washington license plate BNL7436 ("ANDREI's Second

25  Vehicle"). Database checks revealed that ANDREI is the registered owner of the vehicle.

26  The meeting was audio recorded.

27

28

COMPLAINT/ANDREI - 11
USAO #2019R00061

40.   During the meeting, UCA-2 provided ANDREI $30,000 in cash to exchange for bitcoins, which ANDREI counted with a money counter. ANDREI charged an exchange fee of 8% for the transaction.

41.   I provided ANDREI the wallet address to which the bitcoins were to be transferred, sent via text message to the telephone number (206) 910-4647, using an undercover phone. Using his cell phone, ANDREI transferred to the law enforcement wallet approximately 7.16808708 BTC, which were worth approximately $27,615.13 on the date of the transaction.

42.   During this meeting, UCA-2 informed ANDREI that Carlos was UCA-2's partner and was involved with "girls." UCA-2 further advised ANDREI that Carlos invested in UCA-2's business, which was growing marijuana. Despite hearing about UCA-2's marijuana distribution operation, and Carlos's involvement with "girls," ANDREI agreed to provide bitcoins to UCA-2 in exchange for cash.

43.   UCA-2 told ANDREI that UCA-2 wanted to send $200,000 per week or twice a month overseas. ANDREI responded "no problem" but told UCA-2 that he prefers to do exchanges between $50,000 and $100,000 each time he meets with UCA-2. ANDREI explained "I don't like to travel with so much money, if I get pulled over or something, I don't want to lose it." UCA-2 explained that he/she had previously sent bulk cash abroad, and hired someone to drive bulk cash in a vehicle, but that it had been seized on occasion. ANDREI explained that sending Bitcoin abroad was "safer" and agreed to help UCA-2. ANDREI also mentioned that "the U.S. has a lot of regulations" but that it would be easier to exchange bitcoins overseas. UCA-2 explained that his/her "weed operation is big" and "I don't know what to do with my cash" so he/she wanted to send it to Vietnam. ANDREI agreed to assist UCA-2 by providing UCA-2 with bitcoins in exchange for cash. ANDREI advised UCA-2 that the "whoever is taking the bitcoins . . . and giving the cash, he should be smart enough to not to be . . . traced . . . it's not that hard."

COMPLAINT/ANDREI - 12
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

44.   At no time during the transaction did ANDREI request any identification from UCA-2 or ask for "KYC" information.

### E.   The April 19, 2019 Meeting

45.   On April 19, 2019, ANDREI and UCA-2 met at a Starbucks in Tukwila, Washington.  ANDREI arrived at Starbucks in ANDREI's Vehicle.  After briefly meeting inside the Starbucks, UCA-2 and ANDREI moved the meeting to UCA-2's vehicle.  This meeting was audio and video recorded.

46.   UCA-2 provided ANDREI with $50,000 in cash to exchange for bitcoins. ANDREI retrieved a money counter from his backpack and used it to count UCA-2's cash.  ANDREI charged an exchange fee of 8% for the transaction.  Using his cell phone, ANDREI transferred to the law enforcement wallet approximately 8.6849978 BTC, which were worth approximately $45,898.24 on the date of the transaction.

47.   During the meeting, UCA-2 told ANDREI that "the problem with using Carlos is that he trafficking a lot of girls and he do all kinds of girls and I don't like that.  And this money is from there, too.  From the get all the girls and underage . . ." to which ANDREI responded "better don't tell me.  I don't need to know."

48.   Despite this exchange, ANDREI reaffirmed to UCA-2 that ANDREI could exchange large amounts of currency for bitcoins.  UCA-2 and ANDREI discussed exchanging between $150,000 to $200,000 in cash for bitcoins.  ANDREI said he preferred to conduct exchanges for $100,000 each time he meets with UCA-2.  ANDREI told UCA-2 that ANDREI did not want to transport $200,000 in cash in his vehicle. ANDREI stated that he would not have an answer if he was pulled over by a police officer or got into a car accident with $200,000 in the car.  ANDREI explained that if he were stopped and asked "to explain $200,000, there is no f*cking explanation for that;" instead ANDREI stated that he would just "shut up and get a lawyer."

49.   At no time during the transaction did ANDREI request any identification from UCA-2 or ask for "KYC" information.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**F.   The June 27, 2019 Meeting**

50.   On June 26, 2019, ANDREI and an HSI undercover agent ("UCA-3") met at a Starbucks in Tukwila, Washington. After briefly meeting in the parking lot, ANDREI moved the meeting to UCA-3's vehicle. This meeting was audio and video recorded.

51.   During this meeting, UCA-3 explained that he/she worked with Carlos and UCA-2. UCA-3 provided ANDREI with $50,000 in cash to exchange for bitcoins. ANDREI used the money counter to count the money. ANDREI charged an exchange fee of 8% for the transaction. Using his cell phone, ANDREI transferred to the law enforcement wallet approximately 4.356062 BTC, which were worth approximately $46,487.03 on the date of the transaction.

52.   UCA-3 told ANDREI "So Carlos wanted me to talk to you about a little bit of like what he's into so you know 'cause he's looking to do a bigger deal a little later . . . I mean you know he runs girls and you don't have any issue with that?" ANDREI responded "I honestly would like not to know about things." UCA-3 replied "I get that but at the same time he's like he wants . . ." ANDREI interrupted "I don't care, I don't care and I don't want to know. I mean you know, this is, it's a lot of money, it's going to be a lot of attention, and if anybody asks I want to say it's like I have no f*cking idea. And it's better for you, too." ANDREI further told UCC-3 "I have no problem, I can help him out with big amounts and all . . ." UCA-3 explained that Carlos "found someone that he trusts and likes and so he doesn't want to put you in a situation where you're uncomfortable. Like he wants you to know, like hey man, this isn't, this is not legit money." ANDREI responded "of course it's not legit money."

53.   At no time during the transaction did ANDREI request any identification from UCA-3 or ask for "KYC" information.

**G. Concealment Activity**

54.   Based on my training, experience, and information gained during the course of this investigation, I know that individuals use unlicensed cryptocurrency exchangers,

COMPLAINT/ANDREI - 14
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   rather than legitimate, licensed exchanges, in order to avoid law enforcement attention
2   and to conceal criminal proceeds.  Registered cryptocurrency exchanges generally sell
3   cryptocurrencies at their market price plus a service fee, which would be less than the fee
4   ANDREI charged.  However, these exchanges also maintain records of their transactions,
5   collect customer information, and generate a suspicious activity report ("SAR") when
6   warranted.

7        55.    As explained in further detail above, ANDREI did not request any "KYC"
8   information, did not file SARs despite learning of criminal activity, and advised the
9   undercover agents on how to further conceal their financial transactions.  For example,
10  ANDREI: (1) told UCA-1 to not store his/her wallet on a device that could be traced back
11  to him/her through an IP address; (2) told UCA-2 that, when sending bitcoins abroad, the
12  recipient should take precautions to ensure the funds cannot be traced; and (3) explained
13  to the undercover agents that he wanted to avoid transporting large quantities of cash in
14  his vehicle, in case he was pulled over and questioned by police.  This activity suggests
15  that ANDREI sought to conceal the source of the funds provided to him by the
16  undercover agents, which were represented to be proceeds of human and drug trafficking.

17  **IV.   Laundering Dark Net Drug Proceeds**

18       56.    Since at least June 2018, ANDREI also purchased bitcoin from UCC-1 in
19  exchange for cash.  As of at least October 2018, ANDREI knew, or should have known,
20  that UCC-1 obtained these bitcoins by selling narcotics on the Dark Net.

21       57.    From at least June 2018, UCC-1 sold narcotics on Dream Market, a Dark
22  Net marketplace in exchange for bitcoin.  At various times, these narcotics included
23  heroin, cocaine, and methamphetamine.  For these activities, UCC-1 was arrested in June
24  2019.

25
26
27
28

58.     During a post-arrest interview, after being advised of his/her *Miranda* rights, UCC-1[7] explained that he/she used ANDREI in order to cash out the bitcoins earned from selling narcotics on Dream Market.  UCC-1 stated that he/she located ANDREI's ad on localbitcoins.com, offering to purchase bitcoins in exchange for cash.  UCC-1 stated that he/she met with ANDREI approximately twice per week, and exchanged a few thousand dollars' worth of bitcoin during each transaction.  UCC-1 noted that ANDREI charged a 9% fee per transaction and did not ask UCC-1 for any identification before purchasing the bitcoins.

59.     UCC-1 claimed that he/she didn't verbally discuss the source of his/her bitcoins with ANDREI, but talked about cryptocurrency and the Dark Net in general terms.  UCC-1 recalled that he/she may have texted ANDREI about bitcoins that were held in escrow on Dream Market, waiting to be released.

60.     Law enforcement has reviewed communications between UCC-1 and ANDREI, located on UCC-1's cell phone.  ANDREI is listed in UCC-1's phone as "BTC Ste'phan," along with the telephone number (206) 414-8810.  Law enforcement believes this telephone number is associated with ANDREI for at least the following reasons:

a.     This telephone number—(206) 414-8810—is also listed in the subscriber information for an email account opened in the name "Aurel Andrei"— andrei.aurel@gmail.com.  The recovery email for this account is andrei.stefan.andrei@gmail.com.

b.     The name listed in the subscriber information for andrei.stefan.andrei@gmail.com is "Stefan Andrei."  This email address is also listed as ANDREI's contact information on his Ally Bank account.

c.     I believe that these two email accounts— andrei.stefan.andrei@gmail.com and andrei.aurel@gmail.com— are associated and used by ANDREI because the email addresses contain his last name, and the andrei.aurel@gmail.com account is often logged into in close in time to the andrei.stefan.andrei@gmail.com account using the same IP address.

---

[7] UCC-1 is currently facing federal charges for selling narcotics on Dream Market, has prior arrests related to possession of controlled substances, and has been convicted of making false or misleading statements to police and failure to comply.

COMPLAINT/ANDREI - 16
USAO #2019R00061

61.     A portion of the messages located on UCC-1's cell phone, obtained

pursuant to a warrant, are excerpted below.

| | | | |
|---|---|---|---|
| 10/12/18<br>3:24 p.m. | ANDREI | "[UCC-1], can you meet today after traffic with whatever you have gathered but mainly for the 2nd thing we talked about" |
| | . . . | | |
| 10/12/18<br>11:00 p.m. | UCC-1 | "No problem" |
| | . . . | | |
| 10/13/18<br>1:33 a.m. | UCC-1 | ". How much of each did you want?  Running real low on the yay-o.[8]  I've been waiting on the guy for a zip for a minute M" |
| 10/13/18<br>1:34 a.m. | ANDREI | "Wanted a zip but whatever you have" |
| | . . . | | |
| 10/15/18<br>11:50 p.m. | ANDREI | "Do you have more?  I could meet in 2h or this morning" |
| 10/15/18<br>11:50 p.m. | ANDREI | "Coins I mean" |
| 10/16/18<br>10:03 a.m. | UCC-1 | "Hey Bro, I got so[m]e coins and other for ya" |
| | . . . | | |
| 10/16/18<br>10:21 a.m. | UCC-1 | "I got yer large pow pow[9] order too" |
| | . . . | | |
| 10/27/18<br>1:19 a.m. | ANDREI | "Handed 3400 up-front you can send as u take out..." |
| | . . . | | |
| 10/30/18<br>2:59 p.m. | ANDREI | "Hi! Can you send what you have till now please" |

[8] Based on my training and experience, I recognize the term "yay-o" to refer to cocaine and the term "zip" to refer to a unit of measurement for narcotics.

[9] Based on my training and experience, I recognize the term "pow pow" to refer to cocaine.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | | | |
|---|---|---|---|
| 10/30/18 3:00 p.m. | ANDREI | "I already advanced you 3400. If it's more I can meet tonight" |
| 10/30/18 3:01 p.m. | UCC-1 | "The market is holding .65331 in escrow. I'm just waiting for it to release." |
| 10/30/18 3:02 p.m. | UCC-1 | [Sent a picture of an escrow account, with a web address ending in "onion/shippingList," listing a total of .65331 BTC. The picture also shows at least five separate transactions with descriptions referencing sales of between 1 to 3.5 grams of methamphetamine. Based on my training and experience, I recognize this document to be an escrow account list for a Dark Net marketplace.] |
| 10/30/18 3:03 p.m. | ANDREI | "ok, any idea when that will happen? I have a bigger thing tomorrow and trying to plan ...." |
| 10/30/18 3:06 p.m. | ANDREI | "I believe you, I just don't know when they will release, was asking what you think from your experience" |
| 10/30/18 3:26 p.m. | UCC-1 | "Should be filtering in over the next 48 hours. I'm contacting each one to try and hurry it up" |
| | . . . | |
| 11/1/18 9:06 p.m. | ANDREI | "ok, I need a white[10] refill too so if you have and can meet later let's meet." |
| 11/1/18 9:06 p.m. | ANDREI | "the coins you can send anytime anyways. :)" |
| 11/1/18 9:06 p.m. | UCC-1 | "I'm on my way to check on the CO[11] right now." |
| | . . . | |
| 11/2/18 2:57 p.m. | ANDREI | "[UCC-1], about to go to sleep. Can you send what you have till now at below address—I'll need as much as possible tomorrow. And I need some white if we can meet tomorrow" |
| | . . . | |
| 11/3/18 5:36 p.m. | UCC-1 | "Sent .36 buddy" |
| | . . . | |

---

[10] Based on my training and experience, I recognize the term "white" to refer to cocaine.
[11] Based on my training and experience, I believe the term "CO" refers to cocaine.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | | | |
|---|---|---|---|
| 1 2 | 1/7/19 9:39 p.m. | UCC-1 | "Got time to meet?" |
| 3 | 1/7/19 9:40 p.m. | ANDREI | "How much do you have?" |
| 4 5 6 7 | 1/7/19 9:45 p.m. | UCC-1 | "Not much, but I'm in a pinch and need as much as I can raise to work this thing I'm trying to do … if ya know what I mean … D deal.  Anyway I've got about .128 in me.  Probably more on my market acct, but I'd have to go home to get anymore" |
| 8 9 | 1/7/19 9:47 p.m. | ANDREI | "Ok, grab what you can and I'll take it . . . ." |
| 10 11 | . . . 1/7/19 11:43 p.m. | ANDREI | "How much do you need to do your thing?" |
| 12 13 | 1/7/19 11:55 p.m. | UCC-1 | "1000" |
| 14 15 | 1/7/19 11:55 p.m. | ANDREI | "Okay" |
| 16 17 | . . . 1/18/19 12:16 p.m. | ANDREI | "[UCC-1], I need coins.  Please send to that address." |
| 18 19 | . . . 1/28/19 12:16 p.m. | UCC-1 | "The market owes me 2.5 btc right now.  Most of it by tomorrow" |
| 20 21 | 1/28/19 12:17 p.m. | ANDREI | "And I'll be in Everett again tomorrow around noon, I'll get whatever you have left" |
| 22 | 1/28/19 12:17 p.m. | UCC-1 | "You can have it all if you want" |
| 23 24 | 1/28/19 12:18 p.m. | ANDREI | "I'll take it" |
| 25 26 27 | . . . 2/7/19 11:19 p.m. | UCC-1 | " . . . I'm starting to think I'm not making enough BTC.  YOU MAY HAVE TO BE MY NEW MENTOR.  Ill be your faithful apprentice!..not kidding." |
| 28 | | | |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | | | |
|---|---|---|---|
| 2/7/19 11:21 p.m. | ANDREI | "man, you need a lot of cash to start and a source at least to keep you going then lots of bank accounts and exchanges and financial engineering stuff" |
| 2/7/19 11:21 p.m. | ANDREI | "but what started me was a stable source, you know, a milking cow then slowly I built on that" |
| 2/7/19 11:22 p.m. | ANDREI | "but it's not a future thing, might end any time" |
| 2/7/19 11:24 p.m. | ANDREI | "not really, you can always start another shop somewhere else. you should actually have a backup one too" |
| 2/7/19 11:25 p.m. | UCC-1 | "I do, 2 other stores. But they don't come to even 5% of what this current market does" |
| 2/7/19 11:27 p.m. | ANDREI | "yeah, true that" |

62.     Despite exchanging these text messages, and apparently purchasing narcotics from UCC-1, ANDREI continued to provide UCC-1 cash in exchange for his/her bitcoins. For example, on or about the below dates, ANDREI purchased the following amounts of bitcoins from UCC-1:

| Date | Amount[12] | Description of Transaction | Bitcoin Value[13] |
|---|---|---|---|
| 11/3/18 | .351 BTC | Purchased from UCC-1 | $2,235.00 |
| 11/6/18 | .399 BTC | Purchased from UCC-1 | $2,572.63 |
| 11/14/18 | .219 BTC | Purchased from UCC-1 | $1,297.10 |
| 11/24/18 | .357 BTC | Purchased from UCC-1 | $1,458.92 |
| 11/26/18 | .769 BTC | Purchased from UCC-1 | $2,969.69 |
| 11/29/18 | .536 BTC | Purchased from UCC-1 | $2,298.12 |
| 12/26/18 | .548 BTC | Purchased from UCC-1 | $2,101.80 |
| 1/1/19 | .255 BTC | Purchased from UCC-1 | $969.73 |
| 1/3/19 | .284 BTC | Purchased from UCC-1 | $561.36 |
| 1/7/19 | .128 BTC | Purchased from UCC-1 | $520.57 |
| 1/9/19 | .366 BTC | Purchased from UCC-1 | $1,483.38 |
| 1/11/19 | .351 BTC | Purchased from UCC-1 | $1,289.24 |
| 1/26/19 | .27 BTC | Purchased from UCC-1 | $979.43 |
| 1/28/19 | .427 BTC | Purchased from UCC-1 | $1,488.12 |

---

[12] All bitcoin figures included in this affidavit are approximated.
[13] This column represents the approximate value of the bitcoins purchased at the time the transaction was completed.

COMPLAINT/ANDREI - 20
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Date | Amount[12] | Description of Transaction | Bitcoin Value[13] |
|---|---|---|---|
| 2/5/19 | .407 BTC | Purchased from UCC-1 | $1,396.73 |

63.    After UCC-1 transferred these bitcoins to ANDREI's cryptocurrency wallet, ANDREI transferred these bitcoins into yet another wallet.

64.    Based on my training and experience, and the information gained during the course of this investigation, the activity engaged in by ANDREI and UCC-1 suggests an effort to conceal the nature, location, source, ownership, or control of the funds. For example:

a.    UCC-1 paid ANDREI a fee of approximately 9%. Based on my training and experience, and information gained during the course of this investigation, this fee is higher than that charged by legitimate, registered cryptocurrency exchanges.

b.    UCC-1 and ANDREI frequently met in person, approximately twice per week. UCC-1 or ANDREI drove the distance between their residences, located in Seattle, Washington and Everett, Washington, sometimes meeting near the freeway or outside of restaurants or in parking lots. Based on my training and experience, and information gained during the course of this investigation, I know that individuals can sell bitcoins and obtain cash entirely online, without the need for time intensive in-person meetings. They can do so by transferring their bitcoins to wallets controlled by registered cryptocurrency exchanges, selling those bitcoins, and then transferring the proceeds into their bank accounts electronically.

c.    For a portion of their communications, UCC-1 and ANDREI used the encrypted text application, Signal. For example, on January 11, 2019, ANDREI and UCC-1 arranged to exchange .35 BTC for cash. While a portion of those communications were sent via decrypted SMS message, including messages like "How much?" "Where are we meeting?" and "Text me . . . when you get there", on January 15, 2019, ANDREI also communicated with UCC-1 via encrypted text applications. For example, on March 27, 2019, ANDREI messaged UCC-1 "I'll text you in signal." And on November 26, 2018, UCC-1 sent ANDREI the message "Let's switch to Signal" with a link to a Signal web address. Based on my training and experience, and information gained during the course of this investigation, I know that individuals can use encrypted text applications to communicate in order to ensure conversations about criminal activity cannot be intercepted by law enforcement.

65.    ANDREI continued to purchase bitcoins from UCC-1 until at least April 29, 2019.

COMPLAINT/ANDREI - 21
USAO #2019R00061

**V.      ANDREI's Financial Background**

66.     During a text message sent on or about February 7, 2019, ANDREI advised UCC-1 that, in order to set up a bitcoin exchanging operation, "you need a lot of cash to start and a source at least to keep you going then lots of bank accounts and exchanges and financial engineering stuff."

67.     In 2018, ANDREI opened bank accounts at several different financial institutions, many of which were closed, at least one after the financial institution identified suspicious transactions.

a.      For example, in May 2018, ANDREI opened a bank account at Sound Credit Union, which was closed by the bank in or around August 2018 due to fraudulent activity. According to Sound Credit Union, in August 2018, an individual deposited $2,700 into ANDREI's account in order to purchase bitcoins from ANDREI. After ANDREI sent the individual the bitcoins, the individual fraudulently attempted to reverse the $2,700 deposit and withdraw it from ANDREI's account. When contacted by the bank to explain this activity, ANDREI said that he "bought Bitcoin from his friend (who he would not name) and then sold it to his same friend who he gave his acc[oun]t number to in order to rec[ie]v[e] [cash] deposits." ANDREI "said he didn't know there would be other parties involved . . . but later said he didn't ask because he 'didn't want to know all of the details.'" ANDREI said he "would cooperate with the police" but "he talked to his friend who does not want to be named." The account was closed after Sound Credit Union determined that ANDREI "voluntarily compromised his account information to various unknown or undisclosed individuals to conduct transactions of monetary (Bitcoin) purchases which concealed the identity of the true purchaser through third parties."

b.      From June through August 2018, ANDREI opened three accounts at Bank of America—two in the name of his corporation, Coinvoluted LLC. From July through October 2018, Bank of America closed all three accounts, along with two other accounts that ANDREI had previously opened at the bank.

68.     ANDREI's girlfriend, A.K., also opened accounts that were subsequently closed, either voluntarily or by the financial institutions.

a.      For example, in October 2018, ANDREI opened two accounts at Ally Bank in his own name. During the same timeframe, A.K. also opened two accounts at Ally Bank. Ally Bank closed all four accounts in or around March 2019. The transactional activity in A.K.'s accounts followed a common pattern—funds were

COMPLAINT/ANDREI - 22
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

deposited into A.K.'s account and shortly thereafter transferred into ANDREI's accounts. For example, on October 8, 2018, $2,000 was transferred into A.K.'s account. On October 11, 2018, $2,000 was transferred from A.K.'s account to ANDREI's account. Sometimes these funds were transferred in increments that were just below $10,000.[14] As another example, on November 15, 2018, $9,970 was transferred from A.K.'s account to ANDREI's account. Additionally, funds deposited into A.K.'s accounts were also transferred to Coinbase, a licensed cryptocurrency exchange, again in amounts just below $10,000. For example, on October 16, 2018, $9,980 was transferred from A.K.'s account to an account held by Coinbase. Further, on December 6, 2018, $9,985 was transferred from A.K.'s account to an account held by Coinbase. These funds were deposited into ANDREI's account at Coinbase.

      b.    In August 2018, A.K. opened two accounts at BECU, which A.K. requested that the bank close in April 2019. Again, the transactional activity in this account followed a similar pattern—funds were deposited into the accounts and then transferred to ANDREI. For example, on March 28, 2019, $11,600 was transferred into A.K.'s account at BECU. On the same date, $7,500 was transferred to ANDREI. Similarly, on March 25 and 27, 2019, a cumulative $7,000 was transferred into another of A.K.'s accounts at BECU. Also, on April 1, 2019, $9,500 was transferred to ANDREI. In June and July 2019, funds were also transferred to Gemini Trust & Co., a licensed cryptocurrency exchange, including four transfers of $2,500.

      c.    In October 2018, A.K. opened a cryptocurrency account at Kraken, a licensed cryptocurrency exchange. A.K.'s account remains open but, as of July 2019, only holds $0.08 in assets. ANDREI also holds a cryptocurrency account at Kraken. According to Kraken, ANDREI's and A.K.'s accounts are linked by machine cookies—small data files that are used to remember preferences, information, and identify a digital device. Based on my training and experience, and information gained during the course of this investigation, I know that if two accounts are linked by cookies it means that the two accounts were accessed from the same computer or digital device. From October 2018 through May 2019, A.K.'s account was used to make deposits, withdrawals, and conduct cryptocurrency transactions.

      69.    Finally, based on information obtained from Yahoo pursuant to a Court Order, A.K. appears to use the email account amberrk85@yahoo.com. The phone

---

[14] While financial institutions are required to file Currency Transaction Reports when they receive cash deposits in excess of $10,000, this reporting requirement does not apply to wire transfers. Law enforcement is investigating whether ANDREI or A.K. falsely believed that a financial institution would generate a report, or closely examine, wire transfers or intra-bank transfers exceeding $10,000.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

number listed in the subscriber information for that account—206-484-1085—is a telephone number that ANDREI has listed on his financial accounts. According to email headers obtained from Yahoo, on June 5, 2018, December 7, 2018, and March 18, 2019, among other dates, no-reply@localbitcoins.com sent an email to amberrk85@yahoo.com. Based on my training and experience, and information gained during the course of this investigation, these emails suggest that A.K.'s email address was associated with an account on localbitcoins.com.

70.     In light of the foregoing, and based on my training and experience, and information gained during the course of this investigation, I believe that A.K.'s accounts may be being used by ANDREI as a mechanism to further conceal the nature, location, source, ownership, or control of his funds, and to avoid the banks' identification of suspicious activity tied to ANDREI's accounts.

**BACKGROUND ON UNLICENSED MONEY TRANSMISSION**

71.     Pursuant to Title 18, United States Code, Section 1960(a)(1), it is a crime to knowingly conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business. The term "money transmitting," as defined by statute, "includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2).

72.     Section 1960 sets forth three prongs defining when a business constitutes an "unlicensed money transmitting businesses." First, Section 1960(b)(1)(A) makes it a crime to operate a money transmitting business without an appropriate state license where one is required. Second, Section 1960(b)(1)(B) makes it a crime to operate a money transmitting business without registering with federal authorities if required by federal regulation. Finally, Section 1960(b)(1)(C) makes it a crime to operate a money transmitting business—whether licensed by, or registered with, any authority or not—that "involves the transportation or transmission of funds that are known to the defendant to

COMPLAINT/ANDREI - 24
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  have been derived from a criminal offense or are intended to be used to promote or

2  support unlawful activity[.]"

3       73.    Pursuant to the first prong, as set forth above, Section 1960(b)(1)(A) makes

4  it a crime to operate a money transmitting business without an appropriate state license

5  where such operation is punishable as a misdemeanor or felony under state law.  The

6  State of Washington requires such a license when a person engages in the business of

7  accepting cash in exchange for transmitting virtual currencies (which are described

8  further below).  Specifically, Section 19.230.30(1)(a) of the Washington State Code

9  provides that "[a] person may not engage in the business of money transmission, or

10  advertise, solicit, or hold itself out as providing money transmission, unless the person

11  is . . . [l]icensed as a money transmitter."  "Money transmission," in turn, is defined as

12  "receiving money or its equivalent value (equivalent value includes virtual currency) to

13  transmit, deliver, or instruct to be delivered to another location, inside or outside the

14  United States, by any means including but not limited to by wire, facsimile, or electronic

15  transfer."  R.C.W. § 19.230.10(18).

16       74.    The Washington Department of Financial Institutions ("DFI") has issued

17  interim regulatory guidance providing that "[p]ersons engaged in the business of buying

18  or selling virtual currency fall under the definition of money transmission in the Act."

19  *See Interim Regulatory Guidance on Virtual Currency Activities* 2 (December 8, 2014).

20  The DFI specifically addressed the following situation:

21       [T]he buyer of virtual currency provides sovereign currency[15] to a business

22       that either holds value in the form of a desired virtual currency or who upon
        receipt of sovereign currency executes a purchase of the virtual currency

23       from another source. In either case the business ultimately transmits virtual

24       currency value to the buyer. The value is transmitted to a wallet location
        either designated by the buyer or generated by the business.

25

26

27

28  [15] "Sovereign currency" is defined as "fiat or real currency, the money of a government."
   *Interim Regulatory Guidance on Virtual Currency Activities* 2 (December 8, 2014)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    *Id.* at 3. The DFI clarified that this type of transaction constitutes "money transmission

2    and the business must hold a Washington money transmitter license when providing the

3    service to Washington residents." *Id.*

4         75.     Pursuant to the second prong, as set forth above, Section 1960(b)(1)(B)

5    makes it a crime to operate a money transmitting business without complying with the

6    money transmitting business registration requirements under 31 U.S.C. § 5330 and the

7    regulations prescribed thereunder. Section 5330 provides that a money transmitting

8    business must be registered not later than 180 days after the establishment of the

9    business. 31 U.S.C. § 5330(a)(1)(B); 31 C.F.R. § 1022.380(b)(4). The filing of false or

10    materially incomplete information in connection with the registration of a money

11    transmitting business shall be considered a failure to comply with the registration

12    requirements. 31 U.S.C. § 5330(a)(4); 31 C.F.R. § 1022.380(e).

13         76.     FinCEN has stated that an exchanger of a virtual currency is required to

14    register with FinCEN as a money services business ("MSB"). *See Application of*

15    *FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual*

16    *Currencies*, FIN-2013-G001, Department of the Treasury, Financial Crimes Enforcement

17    Network (March 18, 2013) ("FinCEN Guidance"). Specifically, FinCEN's regulations

18    provide that an MSB includes persons operating as a "money transmitter"—i.e., "a

19    person that provides money transmission services." 31 C.F.R. § 1010.100(ff)(5).

20    "Money transmission services," in turn, means "the acceptance of . . . funds or other

21    value that substitutes for currency from one person *and* the transmission of . . . funds, or

22    other value that substitutes for currency to another location or person by any means." *Id.*

23    § 1010.100(ff)(5)(i)(A). FinCEN has clarified that the "definition of a money transmitter

24    does not differentiate between real currencies and convertible virtual currencies." *See*

25    FinCEN Guidance at 3.

26         77.     Pursuant to the third prong, as set forth above, Section 1960(b)(1)(C)

27    provides that it is unlawful to operate a money transmitting business that "otherwise

28    involves the transportation or transmission of funds that are known to the defendant to

COMPLAINT/ANDREI - 26
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  have been derived from a criminal offense or are intended to be used to promote or
2  support unlawful activity."

## BACKGROUND ON CRYPTOCURRENCY

4    78.    Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer,
5  network-based medium of value or exchange that may be used as a substitute for fiat
6  currency to buy goods or services or exchanged for fiat currency or other
7  cryptocurrencies. Cryptocurrency can exist digitally on the Internet, in an electronic
8  storage device, or in cloud-based servers. Although not usually stored in any physical
9  form, public and private keys (described below) used to transfer cryptocurrency from one
10  person or place to another can be printed or written on a piece of paper or other tangible
11  object. Cryptocurrency can be exchanged directly person to person, through a
12  cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is
13  not issued by any government, bank, or company; it is instead generated and controlled
14  through computer software operating on a decentralized peer-to-peer network. Most
15  cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the
16  decentralized network, containing an immutable and historical record of every
17  transaction.[16] Cryptocurrency is not illegal in the United States.

18    79.    Bitcoin[17] is a type of cryptocurrency. Payments or transfers of value made
19  with bitcoins are recorded in the Bitcoin blockchain and thus are not maintained by any
20  single administrator or entity. As mentioned above, individuals can acquire bitcoins
21  through exchanges (i.e., online companies which allow individuals to purchase or sell
22  cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), Bitcoin
23  ATMs, or directly from other people. Individuals can also acquire cryptocurrencies by

24  _____

25  [16] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to
26  obfuscate transactions, making it difficult to trace or attribute transactions.
   [17] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs. Accepted practice
27  is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and
   community, and "bitcoin" (with a lowercase letter b) or "BTC" to label units of the
28  cryptocurrency. That practice is adopted here.

COMPLAINT/ANDREI - 27
USAO #2019R00061

1 "mining." An individual can "mine" bitcoins by using his/her computing power to solve

2 a complicated algorithm and verify and record payments on the blockchain. Individuals

3 are rewarded for this task by receiving newly created units of a cryptocurrency.

4 Individuals can send and receive cryptocurrencies online using many types of electronic

5 devices, including laptop computers and smart phones.

6       80.    Even though the public addresses of those engaging in cryptocurrency

7 transactions are recorded on a blockchain, the identities of the individuals or entities

8 behind the public addresses are not recorded on these public ledgers. If, however, an

9 individual or entity is linked to a public address, it may be possible to determine what

10 transactions were conducted by that individual or entity. Bitcoin transactions are

11 therefore sometimes described as "pseudonymous," meaning that they are partially

12 anonymous. And while it is not completely anonymous, Bitcoin allows users to transfer

13 funds more anonymously than would be possible through traditional banking and credit

14 systems.

15       81.    Cryptocurrency is stored in a virtual account called a wallet. Wallets are

16 software programs that interface with blockchains and generate and/or store public and

17 private keys used to send and receive cryptocurrency. A public key (or public address) is

18 akin to a bank account number, and a private key (or private address) is akin to a Personal

19 Identification Number ("PIN") number or password that allows a user the ability to

20 access and transfer value associated with the public address or key. To conduct

21 transactions on a blockchain, an individual must use the public key and the private key.

22 A public address is represented as a case-sensitive string of letters and numbers. Each

23 public address is controlled and/or accessed through the use of a unique corresponding

24 private key—the cryptographic equivalent of a password or PIN—needed to access the

25 address. Only the holder of an address's private key can authorize any transfers of

26 cryptocurrency from that address to another cryptocurrency address.

27       82.    Although cryptocurrencies such as Bitcoin have legitimate uses,

28 cryptocurrency is also used by individuals and organizations for criminal purposes such

COMPLAINT/ANDREI - 28
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    as money laundering, and is an oft-used means of payment for illegal goods and services

2    on hidden services websites operating on the Tor network.  By maintaining multiple

3    wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law

4    enforcement's efforts to track purchases within the dark web marketplaces.

5        83.    Exchangers and users of cryptocurrencies store and transact their

6    cryptocurrency in a number of ways, as wallet software can be housed in a variety of

7    forms, including: on a tangible, external device ("hardware wallet"); downloaded on a

8    Personal Computer ("PC") or laptop ("desktop wallet"); with an Internet-based cloud

9    storage provider ("online wallet"); as a mobile application on a smartphone or tablet

10   ("mobile wallet"); as printed public and private keys ("paper wallet"); and as an online

11   account associated with a cryptocurrency exchange.  Because these desktop, mobile, and

12   online wallets are electronic in nature, they are located on mobile devices (e.g., smart

13   phones or tablets) or at websites that users can access via a computer, smart phone, or any

14   device that can search the Internet.  Moreover, hardware wallets are located on some type

15   of external or removable media device, such as a Universal Serial Bus ("USB") thumb

16   drive or other commercially available device designed to store cryptocurrency (e.g.

17   Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets may contain an address

18   and a QR code[18] with the public and private key embedded in the code.   Paper wallet

19   keys are not stored digitally.  Wallets can also be backed up into, for example, paper

20   printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words

21   strung together in a phrase) or a complex password.  Additional security safeguards for

22   cryptocurrency wallets can include two-factor authorization (such as a password and a

23   phrase).

24                    **BACKGROUND CONCERNING THE DARK NET**

25       84.    The "dark net" or "dark web" is a portion of the "Deep Web" of the

26   Internet, where individuals must use anonymizing software or applications to access

27   _____

28   [18] A QR code is a matrix barcode that is a machine-readable optical label.

COMPLAINT/ANDREI - 29
USAO #2019R00061

content and websites.  Within the dark web, criminal marketplaces operate, allowing
individuals to buy and sell illegal items, such as drugs, firearms, and other hazardous
materials, with greater anonymity than is possible on the traditional Internet (sometimes
called the "clear web" or simply the "web").  These online market websites use a variety
of technologies, including the Tor network (defined below) and other encryption
technologies, to ensure that communications and transactions are shielded from
interception and monitoring.  Famous dark web marketplaces, also called Hidden
Services, such as Silk Road, AlphaBay[19], and Dream Market[20] operated similarly to clear
web commercial websites such as Amazon and eBay, but offered illicit goods and
services.  There are a number of marketplaces that have appeared on the dark web that
have offered contraband for sale, including narcotics.  Users typically purchase narcotics
through these marketplaces using digital currency such as bitcoin.

85.     "Vendors" are the dark web's sellers of goods and services, often of an
illicit nature, and they do so through the creation and operation of "vendor accounts" on
dark web marketplaces.  Customers, meanwhile, operate "customer accounts."  Vendor
and customer accounts are not identified by numbers, but rather monikers or "handles,"
much like the username one would use on a clear web site.  If a moniker on a particular
marketplace has not already been registered by another user, vendors and customers can
use the same moniker across multiple marketplaces.  Based on customer reviews, vendors
can become well known as "trusted" vendors.

86.     The Onion Router or "Tor" network is a special network of computers on
the Internet, distributed around the world, that is designed to conceal the true Internet
Protocol ("IP") addresses of the computers accessing the network, and thereby the
locations and identities of the network's users.  Tor likewise enables websites to operate

---

[19] AlphaBay was a website on the dark web that offered drugs and other contraband for sale.
Furthermore, I know that AlphaBay was seized by U.S. law enforcement in July 2017.
[20] Dream Market was a website on the dark web that offered drugs and other contraband for sale.
In late March 2019, Dream Market announced it was closing on April 30, 2019 and transferring
its services to a partner company.

COMPLAINT/ANDREI - 30
USAO #2019R00061

1  on the network in a way that conceals the true IP addresses of the computer servers
2  hosting the websites, which are referred to as "hidden services" on the Tor network.
3  Such "hidden services" operating on Tor have complex web addresses, which are many
4  times generated by a computer algorithm, ending in ".onion" and can only be accessed
5  through specific web browser software designed to access the Tor network.  Most
6  "hidden services" are considered dark web services with no legitimate or identified
7  service provider to which legal process may be served.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT/ANDREI - 31
USAO #2019R00061

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## CONCLUSION

87.     Based on the foregoing, I respectfully submit there is probable cause to believe that STEFAN ANDREI has committed violations of Title 18, United States Code, Sections 1960, 1956(a)(3), and 1956(h).

Ernest McGeachy, Complainant
Special Agent
Homeland Security Investigations

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe the defendant committed the offenses set forth in the Complaint.

DATED this 29 day of July, 2019.

HON. MARY ALICE THEILER
United States Magistrate Judge

COMPLAINT/ANDREI - 32
USAO #2019R00061